### 51062. ABERCROMBIE v. HOWARD, WEIL, LABOUISSE, FREDERICKS, INC.

QUILLIAN, Judge.

Plaintiff was an active trader in commodities on the Chicago Board of Trade through the defendant brokerage firm's branch office in Gainesville, Georgia. Defendant had acted as the brokerage agent for plaintiff since July of 1972 until the transactions giving rise to this action in August, 1973. The affidavit of Mr. LeVert, the vice-president of defendant's brokerage firm, showed plaintiff had market positions on August 16, 1973, which required minimum deposits of $1,680,000 and an equity in his account of $2,040,421.32. Defendant alleged plaintiff had contracted to buy 200,000 bushels of August soybeans which would be delivered within ten days if not offset or sold. If delivered, this would require a reduction in equity in his future account of $1,990,000. Plaintiff had also contracted to sell 1,000,000 bushels of wheat, and based on then current market trends, defendants estimated his loss potential to further reduce his equity by $300,000.

On August 16, 1973, defendant issued a margin call to plaintiff for $800,000 "to properly secure their brokerage firm." As of the opening of the market on

August 21, 1973, defendant alleged plaintiff had not answered the margin call and estimated plaintiff's equity to have been reduced by $1,123,995 to $916,426.32 — or an average loss per trading day of $280,998.75. Defendant stated — "to protect itself" because plaintiff had not answered the margin call, under Rule 209 of the Chicago Board of Trade and the "customer's agreement" which plaintiff had signed — on August 21 they "eliminated the positions that [they] felt contained the greatest risk" — the 1,000,000 bushels of wheat and "40 contracts of broilers." Plaintiffs eliminated the wheat and broiler contracts by issuing purchase orders to "partially offset the deposit demand of $800,000." Defendants alleged that they placed the order to buy the 40 contracts of broilers at 9:15 a.m. central daylight time (CDT), and it was executed at 9:30 a.m. CDT.

Plaintiff admitted that he received the margin call for $800,000 on August 16, but that in the past he had been given "not less than five trading days" to meet a margin call, even though Rule 209 of the Chicago Board of Trade states that it "must be made . . . within a reasonable time after demand, and, in the absence of unusual circumstances, one hour shall be deemed a reasonable time."

On the morning of August 21, 1973, plaintiff placed an order with defendant's agent "to buy forty contracts of broilers at the limit down price." In his affidavit, plaintiff stated "this order was placed shortly after the market opened, the opening being at 9:30 a.m." We will assume that this time was central daylight time. The defendant stated that the order was placed at "10:47 a.m. EDT" or 9:47 CDT. The market on broilers on August 21 reached the "limit price down" at 9:43.45 CDT. Teletype communications were used between the Gainesville and New Orleans offices of defendant corporation. Plaintiff stated that sometime after "11:00 o'clock a.m." he was advised that the New Orleans office had liquidated his position in the 40 broiler contracts "prior to the market's opening." Plaintiff immediately called the New Orleans office and talked to Mr. LeVert, who is alleged to have said, "it was just a mistake on our part, just a failure of communication." Following this telephone call defendant

presented plaintiff with a "letter" in which the plaintiff was asked to ratify the acts of the defendant. Plaintiff alleged defendant "demanded I sign it and I refused. Another call was placed to Mr. LeVert and I advised him that I would not sign it because it was not true. He stated that unless I signed the letter, he would liquidate my entire account, thus wiping out a long-term capital gain position . . . or a long-term profit for tax purposes of over $800,000. He stated that he did not care what it wiped out, that he would do it. I then stated that I was signing the letter under threats and duress, and against my will." Another commodity trader in defendant's office witnessed the latter part of this incident and confirmed plaintiff's version of the event.

An employee of the defendant stated that prior margin calls to plaintiff "were always met by him within a few days after the call" and "his employer had never sold or bought any commodity contracts for Mr. Abercrombie without having his express permission through his order to buy or sell." Another commodity trader stated that he "was always allowed a maximum of five trading days to meet any margin call." Plaintiff had been presented with the margin call on Thursday, August 16, 1973, and defendant — according to their affidavits, sold the broiler contract prior to the opening of the market on the fourth trading day after the call.

Plaintiff contended his position was "fully liquid" on August 16, 1973 as he "had just made a cash payment to defendant, several days prior to the transaction in issue here, of one million dollars to secure [his] account." Defendant held negotiable bonds of plaintiff in the amount of $200,000. Plaintiff alleged that on August 16 he had "an equity in [his] account over and above required margins on fixed positions of $2,040,421.32. There was on deposit with defendant an additional deposit of $1,680,000.00 to cover the required published margins. . . From August 16 to August 20, [he] had liquidated certain contracts in order to hold [his] equity position. In addition to this, [he] had put in a standing order to liquidate [his] position in September wheat, which would, if done, restore [his] excess over required margins to approximately one million dollars."

Plaintiff stated he had been making a profit of $22,400 per day on the broiler contracts sold by defendant. If they had been purchased at the limit price down, rather than at the then current market price — as executed by the defendant, plaintiff contends that he would have made an additional $16,100 — after commissions. He brought suit in Count 2 for this amount.

Defendant moved for and was granted summary judgment on Count 2. Plaintiff appeals to this court contending there were genuine and substantial issues of material facts relating to whether there was justification for the issuance of a margin call by defendant on August 16, 1973; whether there was sufficient justification for purchase of the 40 broiler contracts on August 21, 1973, contrary to plaintiff's instructions; and whether the purchase of the broiler contracts by defendant was an exercise of rights under the Chicago Board of Trade Rules or was in fact a mistake on defendant's part. *Held:*

1. The purpose of the summary judgment procedure is to allow a party to pierce the allegations of the pleadings and show the truth to the court and receive judgment where there is no genuine issue of material fact, although an issue may be raised by the pleadings. *Scales v. Peevy,* 103 Ga. App. 42 (118 SE2d 193). The movant has the burden of showing the absence of any genuine issue of material fact. To satisfy his burden the movant must make a showing that is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. *Raven v. Dodd's &c., Inc.,* 117 Ga. App. 416 (160 SE2d 633). Drawing all inferences of fact from the evidence submitted against the movant and in favor of the party opposing the motion (*Gregory v. Vance Pub. Corp.,* 130 Ga. App. 118 (202 SE2d 515)), we find an issue exists as to whether defendant executed the purchase order for the 40 contracts of broilers under the authority of Rule 209 for a failure to meet the margin call, or under the order submitted by the plaintiff.

We weighed the following factors in our decision. Defendant claimed that they eliminated "the positions that [they] felt contained the greatest risk." Therefore, they chose to eliminate first, the broiler contract which was providing a profit of $22,400 per day to the plaintiff,

although the only concern defendant had evidenced prior to that time was on the wheat and soybean contracts which were losing money. The consolidated account of plaintiff, provided the court by the defendant, showed a credit in the broiler contract of $67,200, while the wheat and soybeans account showed a deficit of $287,508.68.

Also of interest is defendant's reference to "200,000 bushels of August soybeans" and "60 contracts of soybean meal." The account provided the court showed "170M August Soybeans" and "40 December Soybean Meal." We realize this account was dated August 20 and plaintiff had eliminated some of his contracts, but if plaintiff had eliminated the 200,000 bushels of August Soybeans, and had a standing order to eliminate the 1,000,000 bushels of wheat — and these were the two contracts that concerned defendant on August 16 — why would they eliminate the broiler contract which was the only account showing a credit?

As teletype communications between defendant's offices provided almost instantaneous transmittal of information, if the order eliminating the broilers was placed at 9:15 a.m. CDT why was plaintiff not notified until after 10:00 a.m. CDT? If the broilers were not purchased pursuant to plaintiff's order, why was his order not executed after it was received in New Orleans?

If the original purchase of the broiler contracts had been made pursuant to defendants exercising their rights under Rule 209 of the Chicago Board of Trade, why was a ratification of defendant's action required of the plaintiff?

If ratification was not required, and construing the evidence favorable to parties opposing the motion for summary judgment, why was coercion and duress used to make the plaintiff ratify his earlier acts?

Defendant denies that plaintiff had placed a standing order to sell the wheat. An employee of defendant stated: "On August 21, 1973, I was aware that my employer and Mr. Abercrombie, were desirous of liquidating 1,000 contracts of September wheat that had been sold short." Defendant continued to deny having any "record of an order for 1,000,000 bushels of wheat being previously entered" and insisted that the "order was entered by the defendant."

If defendant executed the earlier purchase before the market opened pursuant to its right under Rule 209, why did the defendant's vice-president inform plaintiff that "it was just a mistake on our part, just a failure of communication."

Left unanswered is whether there remained a legitimate requirement, on the morning of August 21, to answer the margin call of August 16. Plaintiff stated that he "liquidated certain contracts in order to hold [his] equity position" between August 16 and August 20, and put in "a standing order to liquidate his position in September wheat." If the absence of the 200,000 bushels of August soybeans from the August 20 general account indicated that it was liquidated, the standing order to sell the wheat could have erased defendant's concern about meeting the August 16 margin call. When plaintiff's account was totaled for the close of August 21, the liquidated balance was $916,426.32. It would appear that the sale of the broiler contracts may not have been required.

Because of the closeness of the time factor involved in placing of plaintiff's order, and that of the defendant's entry of its order and the sale; and lack of notification to plaintiff by defendant of their entry of the order and its execution, until after the entry of the order by the plaintiff; and plaintiff was notified by defendant's vice-president of a mistake, following placement of the order; and unanswered questions to the issues posed above; when construed in a light most favorable to the party opposing the motion, we find the trial court erred in granting the motion for summary judgment for defendant as to Count 2.

2. Although Division 1 is sufficient to dispose of this appeal, the second enumeration of error and argument of defendant and plaintiff raises an issue as to whether plaintiff had one hour to meet the margin call, absent unusual circumstances, or whether because of the "customary practices of [plaintiff] and [defendant] in their past business dealings" any legal justification existed for defendant to consummate the sale of the broiler contract on August 21, 1973.

We have concluded that an issue existed as to

whether the parties departed from the terms of the customer's agreement and the Chicago Board of Trade rules, by such a course of business dealing, that before either could enforce the literal terms of the contract, reasonable notice must be given the other party of intention to rely on the exact terms of the agreement. Code § 20-116; *Carolina Life Ins. Co. v. Moultrie,* 40 Ga. App. 15 (1) (148 SE 628); *Southern Savings Bank v. Dickey,* 58 Ga. App. 718 (199 SE 546); *Chalkley v. Ward,* 119 Ga. App. 227 (166 SE2d 748). The question of whether there had been such mutual disregard of terms of the contract as is contemplated by Code § 20-116 is for the jury. *Mauldin v. Gainey,* 15 Ga. App. 353 (5) (83 SE 276); *Craig v. Craig,* 53 Ga. App. 632, 635 (186 SE 755); *Haynie v. Murray,* 74 Ga. App. 253 (2) (39 SE2d 567); *Prothro v. Walker,* 202 Ga. 71 (1a) (42 SE2d 114).

Defendant's contention that the provisions of this contract forbidding a waiver, alteration, modification or amendment, unless committed to writing and signed, would prevent our holding that the time in which a person was permitted to answer a margin call could have been waived, is not persuasive. This issue was addressed in *Few v. Automobile Financing, Inc.,* 101 Ga. App. 783, 784 (115 SE2d 196), and in a well reasoned (en banc) opinion the court held that "the provision against waiver of contractual rights may itself be found by the jury to have been waived." Accordingly, whether the parties departed from the terms of their agreement by a course of business dealing as to show mutual disregard of the contract terms as is contemplated by Code § 20-116 should have been submitted to the jury.

*Judgment reversed. Pannell, P. J., concurs. Clark, J., concurs in the judgment only.*

ARGUED SEPTEMBER 3, 1975 — DECIDED
OCTOBER 8, 1975.

*Greer, Sartain & Carey, Jack M. Carey, E. Wycliffe Orr,* for appellant.

*Robinson, Harben, Armstrong & Millikan, B. Carl Buice, Emory F. Robinson,* for appellee.